**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JULIANA GRIFFO,**<br>**Plaintiff,**<br><br>**vs.**<br><br>**OCULUS VR, INC., et al.,**<br>**Defendants.** | **Case No.: SA CV 15-1228-DOC (MRWx)**<br><br>**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [96]** |

Before the Court is Oculus VR, Inc. ("Oculus VR") and Palmer Luckey's (collectively, "Defendants") Motion for Summary Judgment, to Dismiss for Lack of Standing, and/or to Strike Jury Demand ("Motion") (Dkt. 96). The Court heard oral arguments on September 17, 2018.

## I. Background

Defendants ask this Court to grant summary judgment, arguing that Plaintiff Juliana Griffo ("Plaintiff") is not entitled to any of the remedies she seeks in her action for copyright infringement because she is not entitled to damages and therefore lacks Article III standing. Defendants do not argue the merits of Plaintiff's underlying copyright claim.

### A. Facts[1][2]

During the relevant events, Plaintiff Juliana Griffo was a graduate student at the University of Southern California ("USC") in the Interactive Media Division of the School of Cinematic Arts. Declaration of Michael Kwun ("Kwun Decl."), Ex. F at 26. Griffo worked on "mixed reality" projects that merge real and virtual worlds. *Id*. at 27. Griffo's thesis project, called "Shayd," is a mixed-reality installation that uses tracking hardware to enable a user to walk around the fictional planet of Shayd. *Id*. The project combines a physical set with a virtual reality computer program. *Id*. at 30. Griffo published her thesis on May 5, 2012, and registered copyright in Shayd with an effective date of August 10, 2012. Statement of Genuine Disputes ("SGD") (Dkt. 108-1) ¶¶ 2–3. She did not register a copyright in the Shayd computer game or the Shayd character art until 2016. *Id*. ¶ 4.

Defendant Luckey worked at the Mixed Reality Lab at USC and developed a prototype for the Oculus Rift headset ("Oculus Rift"), which is a head-mounted display that when connected to a compatible computer enables the user to experience virtual reality. *See* Answer

[1] Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

[2] The record is viewed in the light most favorable to the nonmovants so long as their version of the facts is not blatantly contradicted by video evidence. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)). The mere existence of video footage does not foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage. *Id*.

(Dkt. 59) ¶ 7. Griffo met Defendant Luckey at the Mixed Reality Lab. *Id*. ¶ 8. Luckey was part of the team that paired Shayd with a head-mounted display and tracking system. *Id*.

On August 1, 2012, Oculus VR launched an online crowdfunding campaign on Kickstarter, a platform for funding creative projects. Declaration of Brendan Iribe ("Iribe Decl.") (Dkt. 97) ¶ 2. The campaign was for the first Oculus Rift developer kit, called the "DK1." *Id*. The Kickstarter campaign featured a promotional video that included several, multi-second shots of the Shayd videogame footage. SGD ¶¶ 28, 32; Declaration of Russell Selmont ("Selmont Decl."), Ex. D.[3] Defendants intended from the outset to create a Kickstarter campaign and Defendants admit that their aspiration was "to raise capital that can be used for future development while building awareness and momentum around the Oculus Rift and brand." SGD ¶ 26.

The Kickstarter video is approximately four minutes and 52 seconds in duration and includes testimonials from several software developers and business persons. Selmont Decl., Ex. D. The video also uses four separate clips featuring the Shayd footage. The first use of the Shayd footage is 14 seconds into the video. *Id*. This roughly two-second clip shows an out-of-focus individual wearing a head-mounted display with the colorful world of Shayd featured in the background. *Id*. As the user lifts his head lifts up toward the ceiling, the Shayd footage tracks the movement, showing a large moon-like object in the sky. *Id*. The second use of the Shayd footage is approximately three minutes and 18 seconds into the video. *Id*. This roughly five-second clip shows the now in-focus individual wearing a head-mounted display turning his head in various directions, with the Shayd footage tracking his movements in the background. The third use of the Shayd footage is approximately three minutes and 48 seconds into the video, and is nearly identical to the second use in duration and content. *Id*. The fourth use of the Shayd footage is approximately 4 minutes and 20 seconds into the video. *Id*. This roughly 5-

[3] Exhibit D to the Selmont Declaration is a printout of the YouTube page that displays the Kickstarter video with the Shayd videogame footage. The exhibit also provides a link to the Kickstarter video itself. Defendants object to the exhibit as irrelevant because it is "a printout from a webpage" and does not address the content of the video. Defs.' Objections ¶ 28. Defendants do not object to the content of the video available via the link provided in the exhibit. The content of the video is highly relevant, and therefore the Court overrules Defendants' objection to Exhibit D under Federal Rule of Evidence 401 and finds the exhibit admissible as video evidence.

second clip tracks the user's lateral head turns, revealing about 180 degrees of the Shayd world. *Id*.

The clips of the Shayd videogame footage were the only images in the Kickstarter video demonstrating how the Oculus Rift headset worked and what a user would see and experience when using the hardware. SGD ¶ 28.[4] Defendant Luckey testified that Oculus VR used the Shayd footage in part because it was "reasonably good looking," "easy to get working," and a "good piece of software" given the time and resources used to create the project. SGD ¶ 45; Selmont Decl., Ex. B at 142–144. Defendant Luckey testified that because Griffo was able to develop the Shayd project and get it running on the Oculus Rift headset in a "very short period of time," this demonstrated the potential for others to create virtual reality software quickly. Declaration of Michael Kwun ISO Reply (Dkt. 119) at 4–8. Defendant Luckey testified that this made him "really excited" about developing the Oculus Rift prototypes so that game developers could use the hardware for themselves. *Id*.

Former Oculus VR CEO Brendan Iribe testified that he believed it was important to demonstrate the technology and hardware in the Kickstarter video to add credibility that it was a real project. Selmont Decl., Ex. A at 87–88; SGD ¶ 35.[5] Defendants originally planned to use gameplay footage from games designed by John Carmack, including "Doom 3" or "Rage," but on July 27, 2012, they were told they could not use footage of those games in the Kickstarter video. SGD ¶ 36. Defendants had no other gameplay footage that could be ready in time to be included in the Kickstarter video other than the footage from Carmack and Griffo. *Id*. ¶ 37.[6]

---

[4] Defendants dispute that the use of the Shayd footage demonstrated what someone would experience when using the Rift and that the Shayd footage shows how the headset worked and what a user would see and experience. Defs'. Reply to SGD (Dkt. 116) ¶ 28. But Defendants fail to cite to any evidence to support their dispute or otherwise explain why this fact is disputed. Viewing the record in the light most favorable to the nonmoving party, and in conjunction with the video evidence, the Court adopts this fact as undisputed for the purposes of this Motion.

[5] Defendants dispute that Defendants believed that gameplay footage in particular, as opposed to demonstrating the technology and hardware generally, was absolutely necessary. Defs'. Reply to SGD ¶ 35. Again, Defendants do not cite any evidence to support their dispute. At his deposition, Brendan Iribe testified: "*Question*: Did you think that a demonstration of the technology and hardware was absolutely necessary in the Kickstarter video? *Answer*: Yes, I thought it was important to demonstrate the technology and hardware to add credibility that this was a real project." Selmont Decl., Ex. A at 87–88. This statement is adopted as undisputed for the purposes of this Motion.

[6] Defendants dispute that Defendants could not have included other footage, but provide no evidence in support of this assertion. At his deposition, Brendan Iribe testified: "*Question*: Had you been planning to use Doom before John asked you not to? *Answer*: Yes . . . we were going to use some footage from the demo that John [Carmack] had provided, which was the

Griffo admits that she could only speculate how many people watched the video at issue before pledging to the Kickstarter campaign, how many of those people noticed the Shayd images at all, or whether a single person decided to pledge because of the Shayd images. SGD ¶ 13. And while the campaign was running, Oculus VR promoted the campaign at several in-person events where the company conducted live demonstrations of prototypes. Iribe Decl. ¶ 3.

The Kickstarter campaign ran for thirty (30) days. SGD ¶ 3. The campaign surpassed Defendants' 30-day goal of raising $250,000 in substantially less than 24 hours. *Id.* Defendants raised $1.3 million by August 5, 2012. SGD ¶ 33. Oculus VR ultimately raised approximately $2.4 million from the campaign. Iribe Decl. ¶ 4. On June 17, 2013, Oculus VR announced $16 million in Series A funding co-led by Spark Capital and Matrix Partners, along with Founders Fund and Formation 8. SGD ¶ 38; Selmont Decl., Ex. Q. On December 13, 2013, Oculus VR announced the closing of a $75 million Series B investment led by Andreessen Horowitz. Selmont Decl., Ex. R. On March 25, 2014, Facebook, Inc. ("Facebook") entered into an agreement to acquire Oculus VR that provided for total payments of approximately $2 billion in cash and stock. Answer ¶ 20.

After raising the Series A funding, Defendant Luckey posted a note on the Kickstarter webpage proclaiming, "I want to thank everyone for the support. None of this would be possible without you, the people who supported Oculus when it was nothing but a rough prototype and a dream of changing gaming forever!" SGD ¶ 41. After the $75M Series B raise, Defendant Luckey posted a similar note on the Kickstarter webpage stating, "Over the last 16 months, we've grown from a small team working out of our apartments and garages in California to a global team of nearly 70 top engineers, game developers, designers, and scientists. We've built groundbreaking new hardware and software, bringing the seemingly impossible to life. We've seen over 40,000 developers and enthusiasts join the cause and build innovative content that's captured the imaginations of people everywhere . . . Thank you again for making this possible." *Id.* ¶ 2; Selmont Decl., Ex. R. When asked whether the Kickstarter

---

only demo that we had working on the prototype." Selmont Decl., Ex. A at 56. Viewing the record in the light most favorable to the nonmoving party, the Court adopts this fact as undisputed for the purposes of this Motion.

video made it easier for Oculus VR to raise money, Oculus VR CEO testified that the the Kickstarter video "was helpful." SGD ¶ 40[7]; Selmont Decl., Ex. A at 75–76. On May 20, 2014, WIRED magazine posted an article online with a video clip that included images from the Kickstarter video of the Oculus Rift prototype and the Shayd footage.[8] SGD ¶ 43; Selmont Decl., Ex. S. In 2016, two years after the Facebook purchase, Defendants, posted on their Kickstarter page that they were launching commercial products and stated, "On August 1, 2012, we launched a Kickstarter campaign to seed the development of a groundbreaking virtual reality headset—Oculus Rift. Tomorrow we'll be opening Rift preorders on Oculus.com . . . You were there at the beginning of our journey— we couldn't have done it without you." SGD ¶ 47.

### B. Procedural History

On July 31, 2015, Plaintiff filed her Complaint (Dkt. 1). On September 26, 2016, Plaintiff filed the operative Fourth Amended Complaint ("4AC") (Dkt. 44) bringing claims for copyright infringement and fraudulent concealment. 4AC ¶¶ 22–39. On November 28, 2016, Defendants moved to dismiss Plaintiff's fraudulent concealment claim and prayer for punitive damages (Dkt. 47). On December 27, 2016, the Court granted the motion to dismiss (Dkt. 54). On February 10, 2017, Defendants answered the 4AC ("Answer") (Dkt. 59).

Defendants filed the instant motion on August 13, 2018. Plaintiffs opposed on August 27, 2018 ("Opp'n") (Dkt. 108). Defendants replied on August 31, 2018 ("Reply") (Dkt. 115).

## II. Legal Standard

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United*

---

[7] Defendants dispute that Brendan Iribe testified about the Kickstrater video being helpful in raising money from venture capital firms. Reply to SGD ¶ 40. At his deposition, Brendan Iribe testified: "*Question*: Did the Kickstarter video make it easier for Oculus to raise money after it? *Answer*: I think it was helpful." Selmont Decl., Ex. A at 75–76. Viewing the record in the light most favorable to the nonmoving party, the Court adopts this fact as undisputed for the purposes of this Motion.

[8] The Court overrules Defendants' hearsay objection to Exhibit S as the exhibit is not offered for the truth of the matter asserted. The exhibit is admissible to show the continued exposure of the infringing video game footage as late as May 20, 2014. *See* Defs.' Exhibit Objections (Dkt. 108-1) ¶ 43.

*States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).

When the non-moving party bears the burden of proving the claim or defense at trial, the moving party can meet its burden for summary judgment by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990). A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980).

## III. Discussion

Defendants move for summary judgment on the availability of remedies. Defendants argue that because Plaintiff is not entitled to any remedy, her injuries cannot be redressed by a favorable judicial decision, and she therefore lacks Article III standing to continue her case. In the alternative, Defendants move this Court to strike Plaintiff's jury demand on the basis that Griffo has no valid claim for actual or statutory damages, and that disgorgement is an equitable remedy. The Court begins by addressing Defendants' relevant evidentiary objections.

### A. Evidentiary Objections

#### 1. Smith Report

As a preliminary matter, Defendants move to exclude Plaintiff's expert report provided by Dr. Stan Smith in connection with Plaintiff's SGD. *See* Defs.' Objections to Smith Report (Dkt. 118). Defendants acknowledge that they previously moved to preclude Dr. Smith from testifying at all in this case (Dkt. 101), which the Court struck as premature (Dkt. 105).[9] Defendants argue that if the Court concludes that the expert report is relevant to the Motion, then the issue of whether Dr. Smith can testify as an expert is now ripe for discussion. Defs.'

[9] Under the Court's Scheduling Order (Dkt. 68), motions in limine must be filed eleven days prior to and will typically be heard at the final pretrial conference.

Objections to Smith Report at 1. Specifically, Defendants object to Plaintiff's reliance on the expert report in SGD ¶¶ 11, 15, 18, 21, and 44. *Id*.

In the SGD, Plaintiff disputes asserted facts relating to her identification of revenues as being due to the alleged copyright infringement. Plaintiff relies on Dr. Smith's approximation that 20 percent of the revenue streams should be attributed to the alleged infringement. *See* Declaration of Michael Kwun ("Kwun Decl."), Ex. I ("Smith Report") at 6.

Defendants present a two-layered attack on the Smith Report. First, Defendants argue that the report should be excluded because it is not sworn and does not create a material dispute of fact. Defs.' Objections to Smith Report at 1. Second, Defendants argue that Dr. Smith's opinion regarding a remedy in this case is inadmissible because (1) the report fails to disclose an acceptable principle or methodology in support of his conclusion; (2) the opinion regarding Oculus's "value" is irrelevant; and (3) the opinion is conclusory and speculative. *Id*. at 7–14. Plaintiff argues that their expert does not have the burden of showing what percentage of the gross revenue was caused from the infringing conduct, and that in providing his opinion that 20 percent was the appropriate percentage, Dr. Smith went beyond what is required at this pleading stage. Opp'n at 18.

The modern construction of Federal Rule of Civil Procedure 56 does not require the expert report of a non-moving party to be perfectly authenticated at the time a court considers a summary judgment motion, so long as the report can be authenticated. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). The Court rejects Defendants' argument that the Smith Report is inadmissible on summary judgment because it is unsworn. The Federal Rules provide no such requirement for a non-moving party, and the report can be authenticated at trial.[10]

We now turn to the admissibility of the Smith Report's contents. An expert witness may testify only if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

---

[10] Regardless, Dr. Smith filed a declaration on September 13, 2018, authenticating the report (Dkt. 123).

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The court serves a special "gatekeeping" function with respect to expert testimony. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). The court must make an initial assessment of the proposed expert testimony to ensure that it "rests on a reliable foundation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). "An expert's opinions that are without factual basis and are based on speculation or conjecture' are inadmissible at trial and are inappropriate material for consideration on a motion for summary judgment." *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1149 n.4 (9th Cir. 2011) (internal qutations omitted). While on summary judgment, an expert opinion is admissible if it appears that the affiant is competent to give an expert opinion and that the factual basis for the opinion is stated in the affidavit, even if the underlying factual details and reasoning upon which the opinion is based are not, *see Rebel Oil Co., Inc. v. A. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995), an expert declaration is inadmissible when where it contains unsupported speculation and subjective belief. *Guidrox–Brault v. Missouri Pac. Railroad Co.*, 254 F.3d 825, 829 (9th Cir. 2001); *see also United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) ("[I]n the context of a motion for summary judgment, an expert must back up his opinion with specific facts.").

Dr. Smith is a prolific expert testifier who has testified 687 times in the past four years. Smith Report, Ex. 1. He has never previously offered expert testimony in a case about crowdfunding, video games, virtual reality, or head-mounted displays. Kwun Decl., Ex. K at 96–97. He has never been qualified as an expert on venture capital. *Id.* at 103. Here, Dr. Smith relied on twelve documents in performing his evaluation of damages. Smith Report at 2–3. The documents comprise discovery responses, pleadings, deposition transcripts, and a contractual agreement. *Id.* Dr. Smith states in his report that based on his background, training, and experience in venture capital, and his review of the capital Oculus raised over time, it is his opinion that the value of the Shayd footage in the Kickstarter video accounts for approximately 20 percent of Oculus's value at the initial Kickstarter phase, and "equivalent or potentially

lesser percentages" at each subsequent stage of financing, progressing to the eventual Facebook acquisition. Smith Report at 6. Dr. Smith provides a table showing the gross revenue earned at each stage and certain percentages of those gross revenue numbers:

Table 1
Oculus Apportioned Profits from Infringement

| Apportionment Percentage | Kickstarter Funding | Seed Round Funding | Series A Funding | Series B Funding | Facebook Acquisition Proceeds | Total Funding |
|---|---|---|---|---|---|---|
| Full Amount | $2,437,430 | $2,600,000 | $16,000,000 | $75,000,000 | $2,000,000,000 | $2,096,037,430 |
| 15% | $365,615 | $390,000 | $2,400,000 | $11,250,000 | $300,000,000 | $314,405,615 |
| 20% | $487,486 | $520,000 | $3,200,000 | $15,000,000 | $400,000,000 | $419,207,486 |
| 25% | $609,358 | $650,000 | $4,000,000 | $18,750,000 | $500,000,000 | $524,009,358 |

*Id*. The report then "uses the figures from Table 1 to show Oculus's cumulative apportioned profits from infringement at each round of funding" as shown in Table 2:

Table 2
Oculus Cumulative Apportioned Profits from Infringement

| Apportionment Percentage | Kickstarter Funding | Seed Round Funding | Series A Funding | Series B Funding | Facebook Acquisition Proceeds |
|---|---|---|---|---|---|
| Full Amount | $2,437,430 | $5,037,430 | $21,037,430 | $96,037,430 | $2,096,037,430 |
| 15% | $365,615 | $755,615 | $3,155,615 | $14,405,615 | $314,405,615 |
| 20% | $487,486 | $1,007,486 | $4,207,486 | $19,207,486 | $419,207,486 |
| 25% | $609,358 | $1,259,358 | $5,259,358 | $24,009,358 | $524,009,358 |

*Id*. Based on these calculations and his background and experience, Dr. Smith concludes the copyright infringement damages for Defendants' profits fall within the ranges in Table 2 for each revenue stream. *Id.* Dr. Smith does not provide any factual basis for concluding that the infringing video led to 20 percent of each revenue stream. This number is based entirely on his "background, training, and experience in venture capital," review of the Kickstarter video and campaign, and "review of the capital Oculus raised over time, as well as the final sale to Facebook." *Id*. at 6.

The expert report is inadmissible. It contains unsupported speculation and subjective belief without the factual basis for the opinion. Nowhere in the report does Dr. Smith provide the facts underlying the 20 percent calculation. The conclusions do not "rest[] on a reliable

foundation." *Daubert*, 509 U.S. at 597. In the end, Dr. Smith's opinion amounts to little more than an assertion that he is an expert. The Court notes that it is not the first to exclude Dr. Smith's testimony on these grounds. *See* Defs.' Objections to Smith Report at 4 n.21 (listing cases excluding Dr. Smith's opinions); *see also Saia v. Sears Roebuck & Co.*, 47 F. Supp. 2d 141, 146 (D. Mass. 1999) (excluding Dr. Smith's testimony where "the ten to twenty percent range utilized in Dr. Smith's report was in fact arbitrary").

Accordingly, the Court GRANTS Defendants' objection to the Smith Report.

### 2. Koyfman Statements

Next, Defendants object to Plaintiff's reliance on an article published online on March 28, 2014, which includes a statement attributed to Mo Koyfman, a partner at Spark Capital. Defs.' Exhibit Objections ¶ 39; Reply at 12–13 (objecting to Selmont Decl., Ex. P). Spark Capital led Oculus VR's Series A funding. *See* Selmont Decl., Ex. P. Plaintiff relies on the exhibit to show that Mr. Koyfman stated, "Oculus raised money on Kickstarter because it wanted to see if people wanted and would buy the product, and whether developers wanted it and would build games for it. The wildly successful campaign validated that premise, and made it much easier for Oculus to raise money from venture capitalist." SGD ¶ 39. The relevant excerpt of the article does not directly quote Mr. Koyfman, but rather attributes the statement to the Spark Capital partner. *See See* Selmont Decl., Ex. P.

Plaintiff argues that pursuant to Federal Rule of Evidence 801(d)(2)(D) the statement is not hearsay because Mr. Koyfman was an agent and/or employee of Defendants and the statement was made on a matter within the scope of his relationship with Oculus VR. Plaintiff also argues that the Court should find the statement admissible under the residual exception to the hearsay rule. *See* Fed. R. Evid. 807. Plaintiff contends that the statement has equivalent circumstantial guarantees of trustworthiness because Oculus VR CEO Brendan Iribe testified that he agreed with the statement and because the statement is offered as evidence of a material fact, is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts, and admitting the statement will serve the best interests of justice. *See* SGD ¶ 16.

Defendants argue that Griffo's assertion that Koyfman is Oculus VR's employee or agent is without any basis and that common sense dictates that an investor is not, in the ordinary course, an agent of the company simply because of the investment. Reply at 12–13. Defendants note that Plaintiff did not subpoena Koyfman's testimony, and that his purported statements do not meet the express requirements of Federal Rule of Evidence 804(a) for testimony from an unavailable witness. *Id*. Defendants also argue that the residual exception to the hearsay rule does not apply because Griffo points to no indicia of reliability that are equivalent to those of Federal Rules of Evidence 803 or 804. *Id*. Finally, Defendants argue that Plaintiff fails to address the second layer of hearsay, which is the article's reporting of Koyfman's supposed comments. *Id*.

Under Federal Rule of Evidence 801(d)(2)(D), "a statement made by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," is non-hearsay. Fed. R. Evid. 801(d)(2)(D). The rule "requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment." *Breneman v. Kennecott Corp*., 799 F.2d 470, 473 (9th Cir.1986). "When a court is evaluating whether such a foundation has been established, '[t]he contents of the statement shall be considered but are not alone sufficient to establish . . . the agency or employment relationship and scope thereof.'" *Sea-Land Service, Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (quoting Fed. R. Evid. 801(d)(2)).

Under the residual exception to the hearsay rule, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception. Hearsay evidence sought to be admitted under Rule 807 must have circumstantial guarantees of trustworthiness equivalent to the listed exceptions to the hearsay rule. *See United States v. Fowlie*, 24 F.3d 1059, 1069 (9th Cir. 1994). Furthermore, the statement must (1) be evidence of a material fact; (2) be more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) serve the general purposes of the Rules of evidence and the interests of justice by its admission into evidence. Fed. R. Evid. 807.

The record establishes that Koyfman is a partner at Spark Capital, which led Oculus VR's first round of investment. Kwun Decl., Ex. H at 44. But Plaintiff does not sufficiently lay an adequate foundation to show that Koyfman was an agent of Defendants or otherwise made the statement attributed to him within the scope of his relationship with Defendants. Former Oculus VR CEO Brendan Iribe testified that he could not recall ever hearing of a person named Mo Koyfman. Selmont Decl., Ex. A at 73. Plaintiff does not otherwise establish that Koyfman was acting within the scope of agency or employment when he made the statement attributed to him in the article. The statement thus cannot be categorized as admissible non-hearsay under Federal Rule of Evidence 801(d)(2)(D) for the purposes of this Motion.

With regards to the residual exception to the hearsay rule, the statement attributed to Koyfman is not more probative than any other evidence which the proponent can procure through reasonable efforts. Plaintiff apparently chose not to subpoena Koyfman. *See* Reply at 13. Plaintiff contends that the statement has equivalent circumstantial guarantees of trustworthiness because Brendan Iribe testified that he agreed with the statement. SGD ¶ 16. But Plaintiff fails to cite any evidence supporting this assertion. Iribe testified that the Kickstarter video was "helpful" in raising money thereafter, Selmont Decl., Ex. A at 75, but this testimony does not adopt the statement or lend support to the underlying reliability of the statement attributed to Koyfman. Finally, the Court agrees with Defendants that the statement is double hearsay.

Accordingly, the Court GRANTS Defendants' objection to Mo Koyfman's statements as inadmissible hearsay.

**B. Available Damages Under the Copyright Act**

Having addressed the relevant evidentiary objections, the Court now turns to whether Plaintiff is entitled to the remedies she seeks. The Copyright Act provides for two mutually exclusive forms of monetary recovery: (i) actual damages and infringement profits; and (ii) statutory damages. Defendants have moved for summary judgment on the availability of all remedies under the Copyright Act. Mot. at 8–20. Plaintiff does not dispute in her Opposition or Statement of Genuine Disputes that she is not entitled to recover (1) actual damages; (2)

statutory damages; or (3) attorneys' fees.[11] *See* SGD ¶¶ 6–8. Defendants are therefore entitled to summary judgment as to the availability of these remedies. *See* Fed. R. Civ. P. 56(e), *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 256.

The case therefore turns on whether Plaintiff may seek infringement profits. Section 504(b) provides recovery for "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). On its face, § 504(b) does not differentiate between direct and indirect profits. But in the Ninth Circuit, a plaintiff may recover both direct profits (those that are generated by selling an infringing product) and indirect profits (revenue that has a more attenuated nexus to the infringement). *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). The Court will address direct and indirect profits in turn.

**1. Direct Profits**

First, Defendants move for summary judgment on the availability of direct profits as a remedy for Plaintiff's copyright infringement claim.[12]

Direct profits are "those that are generated by selling an infringing product." *Mackie*, 296 F.3d at 914. Direct profit cases include those where the copyrighted work is sold as a whole or where the copyrighted work is included as a part of a larger whole. *See Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985) (finding that defendant's use of several of plaintiff's copyrighted songs in a musical revue entitled plaintiff to recover a portion of the profits from the revue); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001), *as amended* (May 15, 2001) (using a poem in an anthology of poetry to illustrate the plaintiff's burden of providing "evidence of the revenues realized from the sale of the [product] containing the infringing [work]"); *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 927 (N.D. Ill. 2009) (claim for direct profits because the infringed painting used in a textbook "was not

[11] Under 17 U.S.C. § 412, statutory damages and attorneys' fees are not available for "any infringement of copyright in an unpublished work commenced before the effective date of its registration" or "infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." Griffo registered her copyright for her thesis on August 10, 2012—three months and 5 days after she first published her thesis, on May 5, 2012—and therefore cannot seek statutory damages and attorneys' fees. SUF ¶¶ 2, 3, 5.

[12] Defendants state in the SUF that Plaintiff is not seeking direct profits. SUF ¶ 9. Plaintiff does not differentiate between indirect and direct profits in the operative complaint, but asserts in her Opposition that she is entitled to direct profits. 4AC ¶ 29; Opp'n at 3.

used separately in an attempt to promote the sale of the textbook, but instead formed an integrated component of the textbook."). In determining whether a plaintiff is seeking direct versus indirect profits, courts look to whether the profits derived from the sale of a product containing the copyrighted work or from the use of the copyrighted work to promote sales of another product. *See Bergt*, 661 F. Supp. 2d at 927.

Defendants argue that this case turns on indirect profits alone because Defendants did not sell the infringing product, i.e. the Kickstarter video. Reply at 4. Rather, Defendants argue that Defendants used the Kickstarter video to pitch the idea of the Oculus Rift headset itself and that the underlying hardware did not incorporate the copyrighted Shayd video game footage. *Id*. at 5–6. Plaintiff argues that because the donations received via the Kickstarter video are inextricably linked to the idea being pitched in the video, the Kickstarter video itself is in effect being sold. Opp'n at 5. The "necessary corollary" is that if the video contains other infringing material, such as copyrighted video game footage, a direct profit analysis applies. *Id*. Plaintiff argues that just like the sale of a textbook that includes a copyrighted painting, or the sale of an anthology containing an infringing poem, the Kickstarter video was effectively "sold" to donors with the infringing video game footage. *Id*.

The question posed to the Court is precisely what Defendants "sold." There is no doubt that Defendants did not sell the infringing Shayd video game footage as a whole. Plaintiff urges the Court to view Defendants as selling the copyrighted video game footage as part of a larger whole: the Kickstarter video. Opp'n at 4–6. Plaintiff argues that the Kickstarter video is in essence selling a concept rather than a product, and therefore should not be seen as a traditional advertisement. In a traditional advertisement, the viewer watches a video and then goes to the store to purchase the product being advertised. Opp'n at 5. Plaintiff argues that in a Kickstarter video, the donation of money is not directly linked to the purchase of a product, but rather is "inextricably linked to the idea being pitched in the video. In effect, it is the video itself that is being sold." *Id*.

The Court disagrees. Defendants' Kickstarter video is similar to a traditional advertisement for a nascent-stage product. While the transfer of money is not in exchange for

the product itself, the information disseminated as part of the campaign promotes the value of the underlying product (here, the Oculus Rift) to encourage funding. *See generally* Selmont Decl., Ex. D. Regardless of whether the Kickstarter video was in effect selling an idea or a product, it is the Oculus Rift headset concept that was being promoted in the video. Unlike an anthology of poetry that incorporates an infringing poem, or an album with an infringing song, the Oculus Rift headset does not incorporate the infringing video game software. *See Bergt*, 661 F. Supp. 2d at 927. Plaintiff thus cannot recover the direct profits of the infringer. This case therefore turns on whether Plaintiff is entitled to indirect profits on the basis that Defendants used the copyrighted work to promote another product—the Oculus Rift headset.

**2. Indirect Profits**

Defendants argue that Plaintiff cannot seek indirect profits because she failed to disclose any evidence of the indirect profits attributable to the alleged infringement. Mot. at 10–16. Plaintiff argues that she has sufficiently identified three specific gross revenue streams associated with the infringement: (1) money donated via Kickstarter; (2) funds raised from venture capital; and (3) the $2 billion Facebook acquisition. Opp'n at 10–17.

**a. Clarifying The Burden**

As an initial matter, the parties appear to dispute the burden of proof required to seek the disgorgement of profits. *See* Mot. at 14 ("Griffo cannot meet her burden of proving which Kickstarter revenues are due to alleged infringement"); Opp'n at 6 ("Defendants' Motion incorrectly suggests that, when seeking indirect profits, the apportionment burden shifts to Plaintiff"); Reply at 7 ("Griffo has the burden of proving Defendants' gross revenues that are attributable to infringement").

In the Ninth Circuit, to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement." *Mackie*, 296 F.3d at 911. Awarding indirect profits is inappropriate where "they are only remotely or speculatively attributable to the infringement." *Id*. at 914. As discussed by the Ninth Circuit in *Polar Bear*, Section 504(b) sets

forth the evidentiary burdens for the recovery of profits: "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Thus, Section 504(b) creates a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement. *Polar Bear*, 384 F.3d at 711.

However, a plaintiff seeking to recover indirect profits must "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement" and may not simply "toss up an undifferentiated gross revenue number." *Id*. (internal quotes omitted). Although the statute only references the broad term "gross revenue," to conclude that a copyright plaintiff need only provide the company's overall gross revenue, without regard to the infringement, would make little practical or legal sense. "Otherwise, the plaintiff in a copyright action against a multidivision, multi-product company such as General Mills, would need to do nothing more than offer an overall gross revenue number—like $11.5 billion—and sit back." *Id*. Rather, it is "the duty of the copyright plaintiff to establish a causal connection between the infringement and the gross revenue reasonably associated with the infringement." *Id*. at 715. This may be shown by "proffer [ing] some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement." *Id*. at 711 (quoting *Mackie*, 296 F.3d at 911. The Ninth Circuit proclaimed that the standard is straightforward: "[A] copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought." *Id*. at 712.

Two Ninth Circuit cases illustrate this two-step framework. In *Mackie*, plaintiff was an artist who designed an art installation on a public sidewalk. *Id*. at 911. Defendant Seattle Symphony Orchestra contracted with a graphic artist to help design a direct-mail subscription campaign for various symphony series. *Id*. at 912. The contract artist created a collage of images that incorporated plaintiff's art installation into the design; the Symphony, in turn used

the work in a 24-page promotional brochure for a concert series. *Id*. Plaintiff sued for copyright infringement seeking recoupment of profits that the Symphony generated during the advertised season and future seasons. *Id*. at 912–13. The district court granted the Symphony's motion for partial summary judgment on the issue of indirect profits. *Id*. at 911. The Ninth Circuit affirmed the district court's ruling on the grounds that plaintiff had failed to proffer "sufficient non-speculative evidence" of the causal relationship between the Symphony's profits and the infringement. *Id*. at 916. The court emphasized that plaintiff's expert had not seen how it would be possible to establish a causal link between the Symphony's infringing use of plaintiff's art installation and any revenues generated by the advertising materials. *Id*. The court noted that subscribers to the concert series could have been motivated by any number of factors completely unrelated to the artwork in question, such as the Symphony's reputation or the concert series' conductor. *Id*. The thread was even more attenuated because the artwork was but one page in a multi-page brochure that advertised a series of concerts that were unrelated to the artwork itself. *Id*. Rank speculation of that sort will not allow a copyright holder to survive a summary judgment motion on a claim for indirect profits. *Id*.

In *Polar Bear*, the Ninth Circuit again addressed what sufficed to establish a causal connection between copyright infringement and an infringer's indirect profits. 384 F.3d at 711. There, Timex was found liable for copyright infringement based on unauthorized use of film footage owned by Polar Bear. *Id*. at 704–05. The footage, which featured some stars of whitewater kayaking paddling through exotic locations and using equipment bearing the Timex logo, was used to promote Timex watches in two ways. *Id*. First, the footage was used at twelve different trade shows, which generated an average of $30,000 in sales per show. *Id*. at 712. Polar Bear's expert testified that, based on his experience evaluating trade shows, approximately 10–25 percent of the sales were the result of excitement created by the booth promotion of which the infringing materials were a substantial part. *Id*. The Ninth Circuit held that the expert's testimony "established the requisite causal connection between the category of profits sought—revenue from trade booth sales—and the infringement." *Id*. Second, images from the footage were used in a Mountain Dew Booklet, which gave consumers the opportunity

to buy a particular Timex watch at a discounted price. *Id*. This Mountain Dew promotion generated $564,000 in sales for Timex. *Id*. The Ninth Circuit held that sufficient circumstantial evidence supported the argument that the infringement contributed these sales. *Id*. "Polar Bear demonstrated a sufficient causal nexus through evidence that the Mountain Dew booklet contained an advertisement featuring the infringing material, that customers who ordered Timex Expedition watches through the Mountain Dew promotion would have seen the advertisement, and that Timex profited from the promotion." *Id*.

The Court now turns to the revenue streams identified by Plaintiff to determine whether she is entitled to indirect profits under the two-step framework.

**b. Money Donated Via Kickstarter**

The first revenue stream that Plaintiff identifies is the approximately $2.4 million received through the Kickstarter campaign. Defendants argue that Griffo has failed to prove a sufficient causal nexus between the Shayd images and the Kickstarter funds. Mot. at 14–16. Defendants argue that because Plaintiff has stated that "all of the funds" from the campaign are gross revenues that were caused by the alleged infringement, she must therefore proffer facts that "all of the revenue" was at least in part due to the alleged infringement. Reply at 7–8. Defendants contend that Plaintiff has disclosed no facts from which one could determine which Kickstarter revenues came from people who saw the Kickstarter video. Mot. at 12. And Defendants note that Griffo has admitted that she can only speculate how many people watched the video before pledging to the campaign and that Oculus VR promoted the campaign outside of the Kickstarter video. Mot. at 15.

Plaintiff argues that she has met her evidentiary burden to demonstrate a causal nexus between the infringing Kickstarter video and the approximately $2.4 million derived from the Kickstarter campaign. Opp'n at 10–14. First, Plaintiff asserts that the Shayd footage was a crucial element of the Kickstarter video. *Id*. at 12. Second, Plaintiff argues that there is evidence that donors would have seen the Shayd footage. *Id*. Third, Plaintiff notes that Defendants profited from the campaign as they received over $2.4 million in donations. *Id*. at 13. Plaintiff argues that these facts provide sufficient circumstantial evidence to support a

finding that a causal nexus exists between the Shayd footage and the Kickstarter revenue stream.

As discussed, there is a two-step framework for recovery of indirect profits: 1) the copyright claimant must first show a causal nexus between the infringement and the gross revenue; and 2) once the causal nexus is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement. *Polar Bear*, 384 F.3d at 711.

When the infringing material is a prominent part of an advertising campaign for a product, evidence that consumers who purchased the product had seen the advertisement and that the advertisement resulted in profits is sufficient for a finding of causation. *See Garcia v. Coleman*, 2009 WL 799393 (N.D. Cal. 2009) (holding that a "jury could have reasonably inferred that the copyrighted photograph, an integral part of the Sonoma Ridge label for many years, contributed to the sales and profits earned from the Sonoma Ridge wine by Defendants"). On the other hand, when the infringing material is a small part of an advertisement or otherwise too attenuated from the sale of the product, causation may be lacking. *See Mackie*, 296 at 916.

Here, while the footage is only featured in four short clips during the nearly five-minute-long video, the infringing material strikes at the core of the product being promoted. The clips of the Shayd videogame footage were the only images in the Kickstarter video demonstrating how the Oculus Rift headset worked and what a user would see and experience when using the hardware. SGD ¶ 28. Former Oculus VR CEO Brendan Iribe testified that he believed it was important to demonstrate the technology and hardware in the Kickstarter video to add credibility that it was a real project. SGD ¶ 35; Selmont Decl., Ex. A at 87–88. And Defendant Luckey testified that because Griffo was able to develop the Shayd project and get it running on the Oculus Rift headset in a "very short period of time," this demonstrated the potential for others to create virtual reality software quickly. Declaration of Michael Kwun ISO Reply (Dkt. 119) at 4–8. This made him "really excited" about developing the Oculus Rift prototypes so that game developers could use the hardware for themselves. *Id*. Therefore, it follows that Plaintiff has shown there is a triable issue as to whether the Shayd software also made Kickstarter contributors "very excited" about the potential of the Oculus Rift and caused them

to donate to the campaign. Thus, Plaintiff has satisfied her burden under *Mackie*, 296 F.3d at 911 (to survive summary judgment, a copyright infringement plaintiff seeking to recover indirect profits "must proffer some evidence to create a triable issue regarding whether the infringement at least partially caused the profits that the infringer generated as the result of the infringement.")

While Defendants urge the Court to find that *Mackie*—the case involving the symphony brochure—controls in this instance, the facts in that case bear little resemblance to the alleged infringement at hand. Unlike the attenuated connection between a photograph of an art installation used in a brochure and the indirect profits derived from a Symphony concert series, the Shayd footage used in the Kickstarter is inextricably linked to the value of the Oculus Rift headset. It is as if the Seattle Symphony were promoting a concert series featuring a new innovative instrument and in promoting the series distributed clips of the sounds that instrument is capable of making. It is true that like in *Mackie*, contributors to the Kickstarter campaign might have been motivated by a number of factors other than the display of the Oculus Rift's functionality in the Kickstarter video, such as the video's incorporation of statements of support by prominent members of the industry or the several in-person events where the company conducted live demonstrations of prototypes. Selmont Decl., Ex. D; Iribe Decl. ¶ 3. But it is not Plaintiff's burden to show that the copyrighted video footage was the only reason why Defendants received $2.4 million in funds, nor is it her burden to show that the video footage was the main reason why persons contributed funding.[13] *Mackie*, 296 F.3d at 911. Plaintiff need only offer evidence that the Shayd video footage "may have actually influenced the purchasing decisions" of contributors that funded the Kickstarter campaign and create a triable issue regarding whether the infringement "at least partially caused the profits that the infringer

[13] The Court also finds unpersuasive Defendants' argument that Plaintiff has presented no evidence showing how many contributors clicked on the Kickstarter video and saw the infringing images before donating. Reply at 11. There is at least a triable issue regarding whether the Kickstarter video was a central enough feature of the campaign to create a causal nexus. Moreover, we reject the notion that in order to meet the burden of a causal connection Plaintiff is required to submit a declaration of a contributor admitting that she funded the Kickstarter campaign because of the video. *See Polar* Bear, 384 at 714–715 (citing *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 797 (8th Cir. 2003) ("[T]here is no requirement that Polar Bear put Timex customers on the witness stand to testify that they purchased watches because of Timex's use of "PaddleQuest" images")).

generated as the result of the infringement." *See Polar Bear*, 384 at 714; *Mackie*, 296 F.3d at 911.

Griffo has also met her burden under *Polar Bear* to "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement," as she may not simply "toss up an undifferentiated gross revenue number." *Polar Bear*, 384 F.3d at 711. First, the Court notes that the revenue specified in this case is a far cry from the General Mills example in *Polar Bear*, which involved a copyright plaintiff throwing up a gross revenue number "like $11.5 billion" and sitting back. *Id*. Here, Griffo has pointed to specific gains with a strong link to the alleged infringement. Second, as the Ninth Circuit explained, the standard is straightforward: "[A] copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought." *Id*. at 712. This may be shown by "proffer [ing] some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement." *Id*. at 711 (quoting *Mackie*, 296 F.3d at 911). Plaintiff has met her burden at the summary judgment stage.

**c. Venture Capital and the Facebook Acquisition**

Next, Defendants argue that Griffo cannot meet her burden to show the requisite causal nexus between the use of the Shayd video footage and the capital raised from venture capital firms or the $2 billion Facebook acquisition. Mot. at 16–17. Defendants reject the significance of Defendant Luckey's posts to the Kickstarter page regarding the success of the Oculus Rift and assert that Griffo has no evidence regarding what caused the venture capital firms or Facebook to invest in and acquire Oculus VR. Reply at 14.

Plaintiff argues that she has met her burden to show a triable issue of fact regarding the existence of a causal nexus between the alleged infringement and the venture capital funds and Facebook acquisition. Opp'n at 15. Plaintiff notes that former Oculus CEO Brendan Iribe testified that he believed the Kickstarter campaign was helpful in raising money. *Id*. Plaintiff also argues that Defendant Luckey's posting on the Oculus Kickstarter page supports the finding of a causal nexus and notes that the infringing video continued to be referenced by the media even after the Facebook acquisition. *Id*. at 16.

As discussed, at this stage Plaintiff must offer evidence that the Shayd video footage "may have actually influenced the purchasing decisions" of the venture capital funds and Facebook, *Polar Bear*, 384 at 714, and must create a triable issue regarding whether the alleged infringement "at least partially caused the profits that the infringer generated as the result of the infringement." *Mackie*, 296 F.3d at 911.

First, the Court notes the rapid influx of capital following the start of the Kickstarter campaign. Defendants launched the Kickstarter campaign on August 1, 2012. Iribe Decl. ¶ 2. Within five days, Defendants raised $1.3 million. SGD ¶ 33. Less than one year later, on June 17, 2013, Oculus VR announced $16 million in Series A funding. SGD ¶ 38. On December 13, 2013, Oculus VR announced the closing of a $75 million Series B investment. On March 25, 2014, Facebook, Inc. ("Facebook") entered into an agreement to acquire Oculus VR that provided for total payments of approximately $2 billion in cash and stock. Answer ¶ 20. This rapid chain of gains weighs in favor of a causal nexus between the alleged infringement and the gross revenue. Plaintiff has offered evidence that the allegedly infringing video continued to be exposed to the public shortly after the Facebook acquisition. On May 20, 2014, WIRED magazine posted an article online with a video clip that included images from the Kickstarter video of the Oculus Rift prototype and the Shayd footage. SGD ¶ 43.

Defendants' own admissions also support the finding of a triable issue regarding whether the alleged infringement caused the profits generated. When asked whether the Kickstarter video made it easier for Oculus VR to raise money, Oculus VR CEO testified that the Kickstarter video "was helpful." SGD ¶ 40; Selmont Decl., Ex. A at 75–76. After raising the Series A funding, Defendant Luckey posted a note on the Kickstarter webpage proclaiming, "I want to thank everyone for the support. None of this would be possible without you, the people who supported Oculus when it was nothing but a rough prototype and a dream of changing gaming forever!" SGD ¶ 41. After the $75M Series B raise, Defendant Luckey posted another note on the Kickstarter webpage stating, "Thank you again for making this possible." *Id.* ¶ 2; Selmont Decl., Ex. R. In 2016, two years after the Facebook purchase, Defendants, posted on their Kickstarter page that they were launching commercial products and stated, "On August 1,

2012, we launched a Kickstarter campaign to seed the development of a groundbreaking virtual reality headset—Oculus Rift. Tomorrow we'll be opening Rift preorders on Oculus.com …You were there at the beginning of our journey— we couldn't have done it without you." SGD ¶ 47. Viewing this timeline and evidence of continued public exposure of Plaintiff's intellectual property, in the light most favorable to the nonmoving party, Plaintiff has met her burden to show that the infringing footage may have actually influenced the purchasing decisions and that there is a triable issue regarding whether the alleged infringement at least partially caused the profits that the infringer generated. Griffo has also met her burden under *Polar Bear* to "formulate the initial evidence of gross revenue duly apportioned to relate to the infringement," as she may not simply "toss up an undifferentiated gross revenue number." *Polar Bear*, 384 F.3d at 711. Griffo has again pointed to specific gains with a causal link to the alleged infringement. *See id.* at 712 ("[A] copyright plaintiff is bound to no more and no less than its statutory obligation to demonstrate a causal nexus between the infringement and the profits sought."). Defendants' own admissions regarding the importance of the Kickstarter campaign are enough to create a triable issue as to whether the alleged infringements at least partially caused the profits. *Id*. ("A copyright infringement plaintiff seeking to recover indirect profit damages must 'proffer some evidence . . . [that] the infringement at least partially caused the profits that the infringer generated as a result of the infringement.'") (quoting *Mackie*, 296 F.3d at 911). Plaintiff has met her burden at the summary judgment stage.

**3. Whether Any Profits Are Available To Disgorge**

Defendants argue that Griffo's prayer to disgorge profits pursuant to her infringement claim fails for the independent reason that there are no "profits" to disgorge. Mot. at 18–20. Defendants note that in a literal accounting sense, Oculus VR technically lost money on the Kickstarter campaign and generated no "profits" through the venture funding rounds and $2 billion Facebook acquisition. *Id*. Defendants cite to the text of the Copyright Act alone in support of their position. *Id*. Plaintiff argues that Defendants offer no authority for the proposition that such a rigid accounting approach must be used. Opp'n at 20–23.

Section 504(b) of the Copyright Act provides in full:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The term "profit" is not defined in the Copyright Act Definitions, *see* 17 U.S.C. § 101, the Remedies for Infringement, *see* 17 U.S.C. § 504, or in the corresponding Lanham Act Construction and Definitions, *see* 15 U.S.C. § 1127. Plaintiff states that the House notes of both acts do not define the term, and Defendants cite no authority for their position other than the Copyright Act itself. In the absence of such a definition we construe a statutory term in accordance with its ordinary or natural meaning, *F.D.I.C. v. Meyer*, 510 U.S. 471, 476 (1994), and look to the statute's structure and history in order to determine its purpose. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593 (2004).

First, the ordinary meaning of "profit" is "a valuable return" and "gain" as well as "the excess of revenues over expenditures in a business transaction." *See* Black's Law Dictionary (10th ed. 2014); Merriam-Webster Online Dictionary, retrieved September 17, 2018, from https://www.merriam-webster.com/dictionary/profit. The legislative history is consistent with the natural meaning of the term as a "valuable return" and "gain" as opposed to a strict accounting definition of excess revenues over expenditures. The House Report on the Copyright Act states that "[d]amages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act." H.R. Rep. 94-1476, at 161 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5777. Copyright infringers can unfairly benefit from a wrongful act by receiving valuable returns and gains from the infringing conduct. The purpose of the Copyright Act is to prevent unfair benefits in these instances and reaches beyond a strict revenues over expenditures accounting.

As applied here, Defendants are not entitled to summary judgment on the theory that there are no profits to disgorge. Plaintiff has identified three specific revenue streams

through which Defendants gained and received a valuable return. There is a triable issue of fact as to whether Plaintiff is entitled to these indirect profits to prevent the alleged infringer from unfairly benefiting from a wrongful act.

**4. Disgorgement As To Luckey**

Next, Defendants argue that summary judgment should be granted in favor of Defendant Luckey because none of the money from the revenue streams was "received by Palmer Luckey." Mot. at 17. Defendants note that Plaintiff did not send discovery requests or ask deposition questions related to the sums Luckey received as a result of the Facebook acquisition. Reply at 17. Defendants argue that Luckey cannot be held vicariously liable for copyright infringement. *Id*. at 18. First, Defendants point to a lack of evidence demonstrating that Luckey is or at any relevant time was an officer of Oculus VR or had a right to control the conduct at issue. *Id.* Second, Defendants argue that Plaintiff must prove that she is entitled to a remedy from Luckey, which requires proof of the gross revenues he received as a result of his alleged vicarious copyright infringement. *Id*.

Plaintiff argues that it is undisputed that Luckey is the co-founder of Oculus and at all times prior to the sale of Facebook owned a percentage interest therein. Opp'n at 19. Thus it is "axiomatic that for every category of gross revenue generated by Oculus due to its copyright infringement, the amount of gross revenue Luckey profited from would be tied to his percentage interest." *Id*. Plaintiff contends that there is no need to have delineated the exact percentage because the information can be introduced at trial. *Id*. Plaintiff also argues that corporate officers can be held vicariously liable for copyright infringement. *Id*.

There is no doubt that Defendant Luckey was a founder of Oculus VR and there is at least a triable issue as to whether he had a right to control the conduct at issue. Defendant Luckey is prominently featured throughout the Kickstarter video as the "founder" of Oculus VR. Selmont Decl., Ex. D. Defendant Luckey is also key to the underlying infringement claim. Defendant Luckey met Griffo at USC and was part of the team that paired Shayd with a head-mounted display and tracking system. Answer ¶ 8. And Defendant Luckey testified that Oculus VR used the Shayd footage in part because it was "reasonably good looking," "easy to get

working," and a "good piece of software" given the time and resources used to create the project. SGD ¶ 45; Selmont Decl., Ex. B at 142–144.

Defendants' argument that Luckey should be dismissed and effectively released from potential liability for the alleged infringement because Plaintiffs have not specified the percentage of revenue received by Luckey is not persuasive. Plaintiff is not required at the summary judgment stage to specify the allocation of damages between co-defendants. Plaintiff may attempt to establish this allocation of damages at trial through direct and cross examination.

**C. Whether Plaintiff Is Entitled To A Jury Trial**

Finally, Defendants argue that Griffo's demand for a jury trial should be stricken, arguing that disgorgement of profits is an equitable remedy. Mot. at 21. Defendants cite to *Petrella v. Metro-Goldwyn-Mayer, Inc.*, where the Supreme Court held that "like other restitutional remedies, recovery of profits 'is not easily characterized as legal or equitable,' for it is an 'amalgamation of rights and remedies drawn from both systems.'" 572 U.S. 663 n.1 (citing Restatement (Third) of Restitution and Unjust Enrichment § 4, Comment b, p. 28 (2010)). Plaintiff argues that the Court should have a jury reach a verdict and treat the verdict as advisory, if not conclusive, since a jury will need to be empaneled regardless to determine issues of liability. Opp'n at 25.

The Court declines to address the *Petrella* issue at this stage. First, it is not clear what factual disputes will need to be resolved at trial with regards to the underlying infringement claim. *See* Mot. at 1 ("were the issue ever to be reached, Griffo's copyright claim is without merit for many reasons"). The Court is not prepared to dispense of the jury altogether before understanding all the issues that need to be adjudicated. Second, regardless of the effect of the merits portion of the claim, this Court is prepared to submit the disgorgement of profits claim to the jury and treat the disgorgement verdict as advisory, if not conclusory. The *Petrella* issue may be addressed by the parties at the final pretrial conference, if necessary.

**IV. Disposition**

Accordingly, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.

The Court GRANTS Summary Judgment in favor of Defendants on Plaintiff's prayer for statutory damages, actual damages, attorneys' fees, and direct profits. The Court otherwise DENIES Defendants' Motion for Summary Judgment.

DATED: September 18, 2018

David O. Carter

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE